**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ARMAND L. SMITH, BRAZOS
BRAVO ROYALTY TRUST AND
RIO PETRO, LTD., individually
and on behalf of all others
similarly situated private royalty
and overriding royalty owners,

      Plaintiffs,

      vs.                                                    Civ. No. 13-468 JCH/CG

HESS CORPORATION,

      Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on two motions. Plaintiffs' *Motion for Partial Summary Judgment No. 1* requests the Court to hold that Defendant Hess Corporation ("Hess") is liable for breach of contract and for breach of its duty to market. [Doc. 80] Having considered the motion, briefs, record, and relevant law, the Court will grant the motion in part and deny it in part. The Court concludes that Plaintiffs are entitled to summary judgment to the extent they assert that Hess has breached the contract; the Court denies summary judgment on the issue of whether Hess has breached an implied duty to market.

In their second summary judgment motion, *Plaintiffs' Motion for Partial Summary Judgment No. 2*, Plaintiffs request the Court to hold that Hess is not entitled to deduct either production or post-production expenses in calculating royalties or in determining damages. [Doc. 106] Having considered the motion, briefs, record, and relevant law, the Court concludes that the motion should be denied.

**BACKGROUND**

Plaintiffs are royalty and overriding royalty interest owners in the West Bravo Dome Carbon Dioxide Unit in Harding County ("WBDU").  The Court previously issued an unopposed class certification order.  [Doc. 44]  The class consists of about 170 members.  Named plaintiffs are Smith, Brazos Bravo Royalty Trust, and Rio Petro Ltd. ("Plaintiffs").  Defendant is Hess Corporation ("Hess").

Plaintiff Smith is the owner of an undivided one-half interest in the mineral estate underlying lands in the WBDU.  The Smith minerals are the subject of a lease reserving a one-eighth royalty on gaseous substances; Hess has become the lessee obligated to pay royalty to Smith.

Plaintiff Brazos Bravo Royalty Trust is the successor to Public Lands Royalty Trust, and is the owner of overriding royalty interests[1] burdening leases held by Hess in the WBDU.

Plaintiff Rio Petro Ltd. is a Texas limited partnership, and is the owner of overriding royalty interests burdening leases held by Hess in the WBDU.

Defendant Hess is the operator of the WBDU, and is the owner of 100% of the working interest in $CO_2$ production in the WBDU.  Hess takes its share of WBDU $CO_2$ in kind rather than selling it.  With the possible exception of 2008-2009 sales to Linde, Inc., there have been no sales by Hess of WBDU $CO_2$.  The parties agree that the $CO_2$ produced from the WBDU is marketable at the wellhead.  [Doc. 96, pp. 2-3; Doc. 89, p. 4, ¶ 9; Doc. 89, p. 8, ¶ 27; Doc. 126, p. 3, ¶ 21]

---

[1] An overriding royalty "is used to describe a royalty carved out of a working interest created by an oil, gas, or mining lease."  *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 1993-NMSC-039, ¶ 3 n.2, 858 P.2d 66, 69 n.2.  It usually "involves the transfer of a lease in which the lessee-assignor … retains an interest in production in the form of an overriding royalty."  *Id.*

The WBDU was formed in 1983 under the West Bravo Dome Unit Agreement ("Unit Agreement").  § 3.3 of the Unit Agreement provides that the terms of all leases, subleases, and other contracts relating to $CO_2$ production are modified or amended to conform the royalty payment methodology to the provisions of the Unit Agreement.  § 6.3 of the Unit Agreement sets forth the terms for calculation of royalties and overrides to be paid uniformly to all private owners who make up the class.

Commercial production of $CO_2$ in the WBDU began in December 2008.  Plaintiffs allege that they and all class members have been damaged because Hess did not calculate and pay the royalty and overriding royalty on the proper value of the $CO_2$ in accordance with the Unit Agreement.

The Complaint asserts three claims:  Count I—Breach of Contract and of the Covenant of Good Faith and Fair Dealing; Count II—Breach of Implied Covenant To Market; and Count III—Declaratory Judgment and Injunction.  [Doc. 1, pp. 9-13]

This case has been certified as a class action.  [Doc. 44]  The Court has jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).[2]

## LEGAL STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could have an effect on the outcome of the suit.  *Smothers v. Solvay*

---

[2] § 1332(d)(2) provides:  "The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which--
(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;
(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or
(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state."

*Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014).  A dispute over a material fact is genuine if the evidence presented could allow a rational jury to find in favor of the non-moving party.  *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000).  The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in favor of that party.  *Shero v. City of Grove*, 510 F.3d 1196, 1200 (10th Cir. 2007).  The court cannot weigh the evidence and determine the truth of the matter, but instead determines whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).

A defendant seeking summary judgment bears the initial burden of showing that there is no genuine dispute as to a material fact.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  When the defendant does not have the burden of persuasion at trial, it can satisfy its burden at the summary judgment stage by identifying a lack of evidence on an essential element of the plaintiff's claim.  *Id.* at 671.  If the defendant satisfies its burden, the burden shifts to the plaintiff.  *Id*.

The plaintiff cannot rest on the pleadings, but must go beyond the pleadings and "designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment."  *Sealock v. Colo.*, 218 F.3d 1205, 1209 (10th Cir. 2000).  The plaintiff must "set forth specific facts" from which a rational trier of fact could find in the plaintiff's favor, identifying those facts in the affidavits, deposition transcripts, or incorporated exhibits.  *Adler*, 144 F.3d at 671 (internal quotation marks omitted).   The plaintiff cannot rest on ignorance of the facts, on speculation, or on unsubstantiated conclusory allegations.  *Rocky Mountain Rogues, Inc. v. Town of Alpine*, 375

Fed. Appx. 887, 891 (10th Cir. 2010) (unpublished) (internal quotation marks omitted)[3]; *see Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1136 (10th Cir. 2003).

## DISCUSSION

### I.  Plaintiffs' *Motion for Partial Summary Judgment No. 1* [Doc. 80]

Plaintiffs' *Motion for Partial Summary Judgment No. 1* ("MSJ #1) argues that Plaintiffs are entitled to partial summary judgment holding that Hess is liable for breach of contract under Count I and breach of an implied covenant to market under Count II.  Plaintiffs argue that they are entitled to judgment as a matter of law on liability, and that damages should be determined in future proceedings.  Hess filed a response [Doc. 89], and Plaintiffs filed a reply [Doc. 96].

#### A.  Breach of contract

"In New Mexico, oil and gas leases are interpreted like any other contract." *Elliott Indus. Ltd. P'ship v. BP America Prod. Co.*, 407 F.3d 1091, 1112 (10th Cir. 2005).  "The primary objective in construing a contract is to ascertain the intention of the parties."  *Id.* (internal quotation marks omitted).  The intent of the parties is determined by the language employed in their contract.  *Id.*  The written instrument "is presumed to embody their entire contract." *Id.* (internal quotation marks omitted).

Under § 3.3 of the Unit Agreement, all leases subject to the WBDU are modified and amended to conform to the provisions of the Unit Agreement.  [Doc. 1-1, p. 6]  § 6.3 of the Unit Agreement provides:

> 6.3  <u>Basis of Payment to Royalty Owners</u>.  It is recognized by the parties hereto that there is now no preeminent market for Carbon Dioxide Gas. Therefore, the parties hereto agree that, as further consideration for entering into this agreement, royalties paid upon the Unitized Substances allocated to each Tract shall be based on the greatest of the following:

---

[3]The Court cites this and other unpublished opinions for their persuasive value.  See 10th Cir. R. 32.1(A).

> (a)  The net proceeds derived from the sale of Carbon Dioxide Gas at the well whether such sale is to one or more of the parties to this agreement or to any other party or parties.
>
> ….
>
> (c)  Notwithstanding the foregoing provisions, the State, acting by its Commissioner of Public lands may require the payment of royalty for all or any part of the Unitized Substances allocated to the state leases committed to this agreement and marketed or utilized at a price per m.c.f. equal to the maximum price being paid for Unitized Substances of like kind and quality and under like conditions in the same field or area or may reduce the royalty value of any such Unitized Substances (to any amount not less than the net proceeds of sale thereof in the field) if the Commissioner of Public Lands shall determine such action to be necessary to the successful operation of the lands for Unitized Substances purposes or to encouragement of the greatest ultimate recovery of Unitized Substances or to the promotion of conservation of Unitized Substances.

[Doc. 1-1, p. 12]

Plaintiffs allege that Hess sold WBDU $CO_2$ at the well to Linde, Inc. at $2.00 per mcf from July 2008 through May 2009.  [Doc. 80, p. 8, ¶¶ 14-15; Doc. 89, p. 6, ¶¶ 14-15]  Plaintiffs allege that in 2008 Hess bought Bravo Dome Unit ("BDU")[4] $CO_2$ from Kinder Morgan, and that the prices Hess paid under that contract represent prices paid for "like $CO_2$."  [Doc. 80, p. 3] Plaintiffs allege that since June 2013 Hess has paid royalty to the New Mexico State Land Office for WBDU $CO_2$ based on the BDU price, which is based on the prices at which Hess bought from Kinder Morgan.  [Doc. 80, p. 10, ¶ 20]  Hess admits that it paid the New Mexico State Land Office additional royalties, but alleges that it is currently in the process of seeking a refund because Hess should have been allowed to deduct post-production costs.  [Doc. 89, pp. 6-7, ¶ 20] Plaintiffs assert that Hess was required to use these transactions to determine royalty due to Plaintiffs on WBDU $CO_2$.

Hess admits that it has not used any of the methodologies in § 6.3 of the Unit Agreement for determining royalty on WBDU $CO_2$.  [Doc. 80, p. 8, ¶ 11; Doc. 89, p. 5, ¶ 11]  Instead, Hess

---

[4] The Bravo Dome Unit ("BDU") is a $CO_2$ unit adjacent to the WBDU.

admits that it "has used a formula negotiated with a private lessor (the Mitchell Lease) to pay all class members," and that formula is: "$0.60 + {(WTI - $25.00) x 0.01} – TRANSPORTATION ($0.05)."  [Doc. 80, p. 8, ¶ 12; Doc. 80-1, pp. 1-2; Doc. 89, p. 5, ¶ 12]  "WTI" is the West Texas Index price of sweet crude oil.  [Doc. 80, p. 4 n.2]

Because Hess admits it has not used the Unit Agreement methodology for determining royalties, Plaintiffs assert that Hess is liable for breach of contract.  Plaintiffs argue that they are entitled to judgment as a matter of law on liability, and that damages should be determined in future proceedings.

Hess responds that Hess has not breached the contract, or that it was only a technical breach, because Plaintiffs received more than the royalties due under the Unit Agreement methodology.  Hess argues that neither the Linde sales nor the Kinder Morgan purchases are applicable bases for calculation of royalties, and, in the absence of sales at the well, it is obligated to pay the royalty based on "fair value" of the $CO_2$.  [Doc. 89, pp. 11-12]  Hess cites two old Fifth Circuit cases in support.  But even if these Fifth Circuit cases agree with the applicable New Mexico law, neither case holds that there is no breach of contract—instead addressing how to determine the amount of royalty due.  *Phillips Petroleum Co. v. Johnson*, 155 F.2d 185, 188-89 (5th Cir. 1946) (holding royalty to be determined in jury trial on basis of "fair value" of gas if "net proceeds" are stipulated and there are no sales); *Phillips Petroleum Co. v. Bynum*, 155 F.2d 196, 198-99 (5th Cir. 1946) (addressing determination of market price at the well if ascertainable by recent, substantial, and comparable sales in the area, and holding only if impossible to carry out parties' agreement could court allow recovery on basis of reasonable value).

The Court concludes that Hess's response constitutes an argument that the damages were not substantial (or non-existent)—not that there was no breach of contract. The requirement that Hess use the methodology set forth in § 6.3 for determination of royalties constitutes an important obligation. "[F]ailing to perform a contractual obligation when the performance is called for (unless that performance is otherwise excused)" is defined as breach of contract under New Mexico's Civil Uniform Jury Instruction 13-822. The Court concludes that Hess's admitted failure to use any of the Unit Agreement's methods for calculating royalty constitutes a breach of contract. *See Cochrell v. Hiatt*, 1981-NMCA-152, ¶¶ 6-10, 638 P.2d 1101, 1103 (stating principle that incomplete performance of obligations constitutes breach of contract).

The Unit Agreement provides for methods to determine royalties, and those methods must be used if possible. The Court would be rewriting the contract if it were to accept Hess's argument that there was no breach because Hess's method yielded royalties as great as, or greater than, the amounts to which Plaintiffs were entitled. The Court concludes that Plaintiffs are entitled to partial summary judgment, holding that Hess is liable for breach of contract under Count I.

The Court notes Hess's arguments that neither the sales to Linde, Inc. nor the purchases from Kinder Morgan (on which State of New Mexico royalties were based) provide a proper basis for royalty calculation under § 6.3(a) or (c) of the Unit Agreement. The Court need not decide these arguments at this point; the fact remains that Hess failed to utilize any of the methods set forth in § 6.3 to determine royalties—thus failing to perform a contractual obligation.

The Court will grant Plaintiffs' motion to the extent that it requests a holding that Hess is liable for breach of contract.

**B.  Implied duty to market**

Count II of the Complaint asserts that Hess, by taking $CO_2$ in kind, has "breache[d] its implied duty to market the $CO_2$ and has deliberately failed to apply the greatest prices achieved in a sale to Hess or by any other party or parties," thus depriving Plaintiffs of "the right to receive just and proper Royalty for compressed $CO_2$ produced from the Unit."[5]  [Doc. 1, p. 11, ¶¶ 43-44] Plaintiffs argue that, although Hess had the duty "to sell or market to obtain the best prices and terms available" and "to market to achieve the highest possible price for itself and for its royalty owners," Hess "has not met the most basic requirement of the implied covenant to market" because "Hess has not marketed its WBDU $CO_2$ since 2009" but has taken all of its $CO_2$ "in kind."  [Doc. 80, pp. 14-15]   Hess responds that New Mexico courts hold that the implied covenant requires Hess only to "make a diligent effort to produce and market the $CO_2$, so that the lessors may realize on their royalty interest"—not to obtain the best price for the $CO_2$.  [Doc. 89, p. 19]

The Court interprets oil and gas leases as it does any other contract.  *Elliott Indus. Ltd. P'ship*, 407 F.3d at 1112.  The Court must determine the parties' intent from the language employed in their contract; the written instrument "is presumed to embody their entire contract." *Id.* (internal quotation marks omitted).  Implied covenants are not favored under New Mexico law, especially when the written agreement appears to be complete.  *Cont'l Potash, Inc. v. Freeport-McMoran, Inc.*, 1993-NMSC-039, ¶ 56, 858 P.2d 66, 80.  "The general rule is that an implied covenant cannot co-exist with express covenants that specifically cover the same subject matter.'"  *Elliott Indus. Ltd. P'ship*, 407 F.3d at 1112 (quoting *Cont'l Potash, Inc.*, 1993-NMSC-039, ¶ 56, 858 P.2d at 80).  An exception applies only if "it is clear" from the contract and

---

[5]Count II alleges that the $CO_2$ "is not in marketable condition at the wells and the wells are not a market location." [Doc. 1, p. 11, ¶ 42]  But both parties state in later pleadings that the $CO_2$ is marketable at the well.  [Doc. 96, p. 10; Doc. 89, p. 4, ¶ 9 & p. 8, ¶ 27]

circumstances surrounding execution that an unexpressed covenant was within contemplation of the parties or was necessary to effect the parties' intent.  *Cont'l Potash, Inc.*, 1993-NMSC-039, ¶ 57, 848 P.2d at 80.

Plaintiffs fail to cite relevant and persuasive authority showing that they are entitled to judgment on Count II.

Plaintiffs cite a Tenth Circuit case for the proposition that—under Oklahoma law—there is an implied duty "to sell or market to obtain the best prices and terms available."  *Watts v. Atl. Richfield Co.*, 115 F.3d 785, 794 (10th Cir. 1997).  [Doc. 80, p. 14]  As Hess observes, Oklahoma law is irrelevant; New Mexico law controls.  [Doc. 44, p. 4, ¶ 10]  In addition, the authority ultimately relied on for Oklahoma law would not even support Plaintiffs' argument.  *Watts* cited *Barby v. Cabot Corp.*, 550 F. Supp. 188, 189-91 (W.D. Okla. 1981).  Addressing a different issue, and relying on *Tara Petroleum Corporation*, *Barby* stated:  "Under Oklahoma law a producer has a duty to market the gas produced from a well and to obtain the best price and terms available."  *Id.* at 190.[6]  But this was not the holding of *Tara Petroleum Corporation*. Instead, the Oklahoma Supreme Court expressly limited its decision to the effect of a "market price" gas royalty clause, and held that, when a lease provides for royalties based on "the market price at the well," and when the gas purchase contract involved was at "the best price and term available" at the time, the "market price" used to calculate royalties is the same as the price in the gas purchase contract.  *Tara Petroleum Corp. v. Hughey*, 630 P.2d 1269, 1272-74 & n.3 (Okla. 1981).  The case does not hold that the lessee's duty is to obtain "the best price"; on the contrary, the Oklahoma Supreme Court characterized the lessee's duty as obtaining a gas purchase contract

---

[6] *Barby*, 550 F. Supp. at 189-91, held that the defendant violated its duty to market by being dilatory in renegotiating a purchase contract after expiration and that the plaintiffs were entitled to damages because the defendant could have contracted for a higher price which would have resulted in higher royalties.

that was "reasonable when entered into," and "at a minimum fair and representative of other contracts negotiated at the time in the field." *Id*. at 1274.

Nor do the New Mexico cases cited by Plaintiffs support their position under the circumstances of this case. *Libby* held that there is an implied covenant "in the absence of any expressed on the subject as in this lease" to continue work necessary for production and to "proceed with reasonable diligence … to market the product." *Libby v. De Baca*, 1947-NMSC-007, ¶¶ 6-7, 179 P.2d 263, 265 (emphasis added). As Hess observes, *Libby* does not support Plaintiffs' claim that the lessee is required to obtain the highest possible price. More important, the covenant to market was implied in *Libby* when there were no express provisions on the subject.

Stating that a lessor's principal compensation for executing a lease is the royalty, *Darr* held that equity requires construing the lease to include an implied covenant to market the product so that the lessor can realize the royalty interest. *Darr v. Eldridge*, 1959-NMSC-093, ¶¶ 9-16, 346 P.2d 1041, 1043-44. *Darr* is distinguished because in that case the lessors were deprived of any royalty at all; *Darr* does not support Plaintiffs' claim that the lessee is required to market so that Plaintiffs "can secure the best royalty payment possible." [Doc. 80, p. 15]

Plaintiffs cite *Elliott Industries Limited Partnership* ("*Elliott*") for the proposition that a "producer complies with its obligations under the duty to market by 'actively producing gas, processing the gas, and **selling** the refined natural gas.'" [Doc. 80, p. 14 (quoting *Elliott Indus. Ltd. P'ship*, 407 F.3d at 1113) (emphasis added by Plaintiffs)] Plaintiffs emphasize "selling" in an attempt to show that *Elliott* supports their claim under Count II, but the case does not hold that selling is necessary in all cases. *Elliott* in fact undermines Plaintiffs' claim. *Elliott* holds that a duty to market is not implied when the contract treats the subject in express provisions:

New Mexico law has long recognized "an implied covenant on the part of the lessee (in the absence of any expressed on the subject as in [the] lease) that after production of oil and gas in paying quantities is obtained, he will thereafter continue the work of development for production of oil and gas with reasonable diligence as to the undeveloped portion of the leased land."  In addition, the lessee "must proceed with reasonable diligence, as viewed from the standpoint of a reasonably prudent operator, having in mind his own interest as well as that of the lessor, to market the product." ….   The New Mexico Supreme Court later characterized the implied duty to market as an "implied covenant to make diligent efforts to market the production in order that the lessor may realize on this royalty interest."
> ….

…. Elliott relies on this implied duty to supplement the royalty provisions and the "at the well" language, but under New Mexico law, covenants are not implied for subjects that are treated in express provisions.

*Id*. at 1113 (citations omitted).  Neither the language nor the policy expressed in *Elliott* supports Plaintiffs' argument.

First, a duty to market will not be implied when the Unit Agreement "specifically cover[s] the same subject matter" and "speaks to the obligation sought to be implied."  *Cont'l Potash, Inc.*, 1993-NMSC-039, ¶¶ 56-57, 858 P.2d at 80.  "[I]mplied covenants are not favored in law, especially when a written agreement between the parties is apparently complete."  *Id*. ¶ 56, 858 P.2d at 80.  Implying a duty for Hess to market the $CO_2$ would be contrary to New Mexico law:

"In the outset it should be noted that when parties reduce their agreements to writing, the written instrument is presumed to embody their entire contract, and the court should not read into the instrument additional provisions unless this be necessary in order to effectuate the intention of the parties as disclosed by the contract as a whole.  An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument.  It is not enough to say that an implied covenant is necessary in order to make the contract fair, or that without such a

covenant it would be improvident or unwise, or that the contract would operate unjustly."

*Id*. ¶ 55, 858 P.2d at 80 (quoting and adopting *Kingsley v. W. Nat. Gas Co.*, 393 S.W.2d 345, 350-51 (Tex. Civ. App. 1965) (internal quotation marks omitted)). The Unit Agreement expressly covers this subject matter by allowing Hess to either use or sell $CO_2$. [Doc. 1-1, p. 13, §§ 7.3-7.5] As in *Continental Potash, Inc.*, the express provisions of the Unit Agreement "left no room" for the implied covenant for which Plaintiffs argue. An implied covenant to market is "not necessary to give effect to the intentions of the parties"; on the contrary, an implied covenant to market would be "inconsistent with the intentions of the parties as expressed" in the Unit Agreement. *Cont'l Potash, Inc.*, 1993-NMSC-039, ¶ 59, 858 P.2d at 81.

Second, the policy underlying an implied duty to market is to allow lessors to realize their royalty interest. *See Elliott Indus. Ltd. P'ship*, 407 F.3d at 1113; *Darr* 1959-NMSC-093, ¶ 14, 346 P.2d at 1044. But Plaintiffs did realize their royalty interest; when Hess used the $CO_2$, it paid royalties to Plaintiffs.

Third, *Elliott* rejected an argument that there was a breach of an implied duty to market if there was a failure to pay royalties "on the best price reasonably possible." *Elliott Indus. Ltd. P'ship*, 407 F.3d at 1113.

There is no dispute between the parties that Hess is entitled to use, and not sell, $CO_2$. Authority cited by Plaintiffs does not involve contracts allowing the lessee to use rather than sell the product. Plaintiffs cite no relevant and persuasive authority that Hess is required to sell, rather than use, $CO_2$ in order to give Plaintiffs higher royalties. Since Plaintiffs have not carried their burden to support "implication of an unexpressed duty to market," the Court concludes that they have not shown entitlement to summary judgment on Count II. *See Elliott Indus. Ltd.*

*P'ship*, 407 F.3d at 1114.  If no implied duty to market exists, there can be no argument that the lessee should have obtained a higher price for sales under the duty to market.

The Court will deny Plaintiffs' motion to the extent that it requests partial summary judgment holding that Hess is liable for breach of an implied duty to market.

**II.  *Plaintiffs' Motion for Partial Summary Judgment No. 2* [Doc. 106]**

Plaintiffs argue that there are "two actual $CO_2$ sales that provide a means of valuing WBDU $CO_2$ that fit within the Article 6.3 methodology of the Unit Agreement"—sales from Hess to Linde, Inc., and sales from Kinder Morgan to Hess.  [Doc. 126, p. 6]  Plaintiffs move for partial summary judgment on a narrow question of law:  whether Hess is entitled to deduct production or post-production expenses in calculating royalties based on these sales, or in presenting evidence on damages based on these sales.  [Doc. 106, pp. 1, 5]

Hess began production of WBDU $CO_2$ in December 2008.  With the possible exception of sales to Linde, Inc. in 2008-2009, Hess has not sold WBDU $CO_2$ but has taken it in kind for use in the Hess Seminole San Andres Unit enhanced oil recovery project.

The Bravo Dome Unit ("BDU") is a $CO_2$ unit directly adjoining the WBDU.  Oxy is the BDU unit operator, and Hess is a 9.9% working interest owner who pays royalty and overriding royalty on its share of BDU $CO_2$ production.  Hess has purchased BDU $CO_2$ from Kinder Morgan, and has paid royalties to the New Mexico State Land Office based on the Kinder Morgan purchase price.  Plaintiffs argue that the "net-back" mathematical calculation used to determine wellhead value is not applicable to the Kinder Morgan purchase prices.

Plaintiffs' motion is limited to the legal question of whether Hess can deduct production or post-production expenses in calculating royalties or presenting evidence on damages.  Hess's response asserts that post-production costs (but not production costs) can be deducted.  Hess

further asserts that neither the Linde sales nor the Kinder Morgan purchases can be used to calculate royalties under § 6.3, and that § 6.3(c) applies only for royalties due to the State. But the Court is not required to reach all of the issues raised by Hess's response at this time.[7] The Court concludes that, if there are applicable sales, New Mexico law allows deduction of post-production (but not production) expenses in order to reconstruct the value of net proceeds at the well under § 6.3.

### A.  Deduction of expenses under § 6.3

§ 6.3(a) of the Unit Agreement provides that royalties shall be based on the "net proceeds derived from the sale of Carbon Dioxide Gas at the well."  Although they disagree on its application here, the parties agree with the decision of the New Mexico Court of Appeals in *Creson v. Amoco Production Co.*, 2000-NMCA-081, 10 P.3d 853.  *See Elliott Indus. Ltd. P'ship v. BP America Prod. Co.*, 407 F.3d 1091, 1110 (10th Cir. 2005) (approving reliance on *Creson* for "guidance in determining the meaning of 'at the well'").  As in *Creson*, the parties agree that the $CO_2$ is marketable at the well.  *Id.* ¶¶ 8, 24, 10 P.3d at 856, 859.  [Doc. 126, p. 3, ¶ 21; Doc. 118, p. 9, ¶ 21]  The provisions of the unit agreement at issue in *Creson* are virtually identical to those in the case before this Court.[8]

*Creson* holds that it is important to distinguish between production costs and post-production costs.  *Id.* ¶ 13, 10 P.3d at 857.  Post-production costs "generally include transportation costs, expenses of treatment such as dehydration, expenses of compressing gas so that it can be delivered into a pipeline, and other costs incurred in adding value to the well-head

---

[7] Hess further argues that Plaintiffs Brazos Bravo Royalty Trust and Rio Petro, Ltd. are collaterally estopped from arguing against deduction of post-production costs because their predecessors-in-interest were plaintiffs in *Creson* and the state court decided this issue against them in that case.  [Doc. 118, pp. 10-14]  The Court need not reach this additional argument.

[8] The definitions of "Unit Expense" and "Unit Operations" are identical.  *Creson*, 2000-NMCA-081, ¶ 5, 10 P.3d at 854.  [Doc. 1-1, p. 4]  There are two insignificant differences under "Basis of Payment to Royalty Owners"; § 6.3 in the case before the Court includes "now" before "no preeminent market" in the first full sentence, and includes "of the" before "parties to this agreement" in § 6.3(a).  [Doc. 1-1, p. 12]

product."   *Id.* ¶ 14, 10 P.3d at 857 (internal quotation marks omitted).   *Creson* holds that the phrase "net proceeds … at the well" is unambiguous "and means that Plaintiffs are entitled to royalties based on the value of the carbon dioxide gas as it emerges at the wellhead."   *Id.*   The New Mexico Court of Appeals held that post-production costs can be "deducted from the value of the gas at its termination point as a means of establishing the value of the gas at the wellhead, before the gas was sold downstream at an enhanced value," with royalties calculated upon the remainder.  *Id.* ¶ 24, 10 P.3d at 859.  Production costs cannot be deducted.

A later case from the New Mexico Supreme Court reaffirmed these principles, observing: "By definition, 'net proceeds' constitutes 'the sum remaining from gross proceeds of sale minus payment of expenses.'"   *ConocoPhillips Co. v. Lyons*, 2013-NMSC-009, ¶ 3, 299 P.3d 844, 848 (quoting Brian S. Wheeler, *Deducting Post-Production Costs When Calculating Royalty:  What Does the Lease Provide?*, 8 Appalachian J.L. 1, 6 (2008)).  Such a provision makes it clear that the "deduction of certain costs" is contemplated.  *Id.*  "The costs associated with production generally burden only operating interests and, absent an express contractual provision to the contrary, are not chargeable against the royalty interest."  *Id.* ¶ 24, 299 P.3d at 852.  "Even though royalty interest holders are not generally subject to the costs of production, they are usually subject to the costs that are incurred subsequent to production."  *Id.*  When a royalty clause provides for determination based on "net proceeds '*at the well*,'" the lessee is entitled to deduct all post-production costs, regardless of where the sale takes place:

> When the *well* is specified as the point of valuation, it is generally understood that the "lessee is entitled to deduct all costs that are incurred subsequent to production, including those necessary to transport the gas to a downstream market and those costs, such as dehydrating, treating, and processing the gas, that are either necessary to make the gas saleable in that market or that increase the value of the gas."

*Id.* ¶ 17, 299 P.3d at 850-51 (quoting Scott Lansdown, *The Marketable Condition Rule*, 44 S. Tex. L. Rev. 667, 671 (2002-2003)); *id.* ¶ 24, 299 P.3d at 852-53.  Post-production costs may include the cost of compressing, gathering, processing, treating, dehydrating, storing, or transporting the gas.  *Id.* ¶ 24, 299 P.3d at 853.

The Court concludes that the Unit Agreement, read as a whole, shows the parties' intent to calculate royalties based on the net value at the wellhead, whether under § 6.3(a) or § 6.3(c).  Regarding a similar lease with a provision identical to § 6.3(c) in the relevant respects,[9] the New Mexico Supreme Court determined that such a provision required calculation of royalties based on the maximum market price for similar gas in the same field or area—but still based on a wellhead value:

> This clause, therefore does not affect Lessees' ability to deduct post-production costs.  Instead it provides Commissioner with the authority to require that Lessees deduct their post-production expenses from the maximum price being paid for gas of like kind and quality in the same field or area.

*Lyons*, 2013-NMSC-009, ¶¶ 53, 3, 299 P.3d at 858, 848.  Assuming arguendo that § 6.3(c) is applicable to determine Plaintiffs' royalties, under New Mexico law Hess would still be allowed to deduct post-production expenses from the Kinder Morgan purchase price.

Plaintiffs argue that no deductions are allowed on the Kinder Morgan price, because Hess was the purchaser.  But it is only happenstance that Hess is the buyer rather than the seller.  If Hess were the seller, deduction of post-production costs would be allowed under *Creson* and *Lyons* in order to reconstruct a value for sales at the well from that downstream purchase price.

---

[9] The section at issue in *Lyons* provides:  "Notwithstanding the foregoing provisions, the lessor, acting by its commissioner of public lands, may require the payment of royalty for all or any part of the gas produced and saved under this lease and marketed or utilized at a price per m.c.f. equal to the maximum price being paid for gas of like kind and quality and under like conditions in the same field or area or may reduce the royalty value of any such gas (to any amount not less than the net proceeds of sale thereof in the field) if the commissioner of public lands shall determine such action to be necessary to the successful operation of the lands for oil or gas purposes or to encouragement of the greatest ultimate recovery of oil or gas or to the promotion of conservation of oil or gas."  *Lyons*, 2013-NMSC-009, ¶ 49, 299 P.3d at 858 (emphasis omitted).

The object of the deductions under *Creson* and *Lyons* is to determine what a sales value at the well would be; for this purpose, it is irrelevant whether Hess itself incurred these costs as seller or paid these costs (indirectly) as buyer (in the increased downstream purchase price).

Although Plaintiffs agree with *Creson*, Plaintiffs attempt to distinguish *Creson*, contending that post-production costs must in fact increase the value of $CO_2$ "to the mutual benefit of the working interest owners and the royalty owners," and that post-production services here do not increase the value of the $CO_2$ for the royalty owners, but "only increase the value of the $CO_2$ for oil recovery for the benefit of Hess." [Doc. 126, pp. 5, 2] Plaintiffs contend that transportation costs to Texas under the Kinder Morgan sales do not inherently increase the value. [Doc. 126, p. 2] The Court concludes that this is not a correct interpretation of *Creson*, even though the New Mexico Court did sometimes refer to post-production costs as "value-enhancing." *Creson*, 2000-NMCA-081, ¶ 36, 10 P.3d at 862. The discussion in *Creson*, however, referred several times to transportation costs as included in deductible post-production expenses. *Id.* ¶¶ 19-21, 10 P.3d at 858-59. And the New Mexico Court of Appeals affirmed the trial court's conclusion allowing deduction of "'post production value enhancing costs associated with transporting and processing the gas up to the point of sale.'" *Id.* ¶ 12, 10 P.3d at 857 (quoting trial court's decision). Inherent increase in value is not the focus; rather, the focus is to reconstruct a wellhead value by deducting costs that were included in determining the downstream price. This interpretation is confirmed by the New Mexico Supreme Court's characterization of the principle in *Lyons*, stating that the "lessee is entitled to deduct all costs that are incurred subsequent to production, including those necessary to transport the gas to a downstream market and those costs, such as dehydrating, treating, and processing the gas, that are <u>either</u> necessary to make the gas saleable in that market <u>or</u> that increase the value of the gas."

*Lyons*, 2013-NMSC-009, ¶ 17, 299 P.3d at 850-51 (emphasis added; internal quotation marks omitted).

Hess asserts that the Kinder Morgan purchase price includes costs for dehydration, treatment, compression, and transportation.  To the extent that Plaintiffs contend that the Kinder Morgan price should be used to calculate WBDU royalty, the Court concludes that New Mexico law would allow Hess to deduct post-production costs.[10]

To the extent that Plaintiffs argue that Hess, in presenting evidence relevant to damages, should not be allowed to deduct post-production costs, the Court again disagrees.  If the Kinder Morgan sales were shown to be relevant to damages, the issue would be what wellhead value can be reconstructed from the downstream Kinder Morgan purchase price.  As Hess argues, Plaintiffs' Unit Agreement does not entitle Plaintiffs to computation of royalties based on a downstream Kinder Morgan price.  Nor are Plaintiffs entitled to be paid the same royalties as under the BDU.

To determine a wellhead value from the Kinder Morgan sales, Hess is of course not entitled to deduct production costs.  To the extent that Plaintiffs contend that some costs Hess attempts to deduct are production costs, this is a factual issue not currently before the Court and, as a disputed factual issue, cannot be decided now.  The matter of law decided by the Court at this time is that Hess may deduct post-production costs, but not production costs.

**B.  Interpretation of § 14.3**

Plaintiffs argue that § 14.3 of the Unit Agreement shows that post-production costs cannot be deducted in calculating their royalties.  That section provides:

---

[10] The Court makes no specific determination regarding the amounts or appropriateness of any particular deductions. These are factual matters to be resolved in further proceedings.  *See Lyons*, 2013-NMSC-009, ¶ 20 n.1; 299 P.3d at 851 n.1.

14.3  <u>Royalty Owners Free of Costs</u>.  This agreement is not intended to impose, and shall not be construed to impose, upon any Royalty Owner any obligation to pay Unit Expense unless such Royalty Owner is otherwise so obligated.

[Doc. 1-1, p. 21]  "Unit Expense" is defined as "all cost, expense or indebtedness incurred by Working Interest Owners or Unit Operator pursuant to this agreement and the Unit Operating Agreement for or on account of Unit Operations."  [Doc. 1-1, p. 4, § 1.16]  *Creson* resolved this argument against Plaintiffs' position.[11]  The New Mexico Court of Appeals observed that § 14.3 is a standardized provision from the American Petroleum Institute's model form, and that unit agreements generally used in the industry do not contain royalty clause provisions.  *Creson*, 2000-NMCA-081, ¶ 7, 10 P.3d at 856-57.  The unit agreement in *Creson*, however—like the Unit Agreement in the case before this Court—included a royalty provision.  *Creson* held that § 6.3 does not impose costs on royalty owners, "but was merely used to determine the 'net value at the wellhead,' on which the Unit Agreement clearly states royalties were to be calculated."  *Creson*, 2000-NMCA-081, ¶ 29, 10 P.3d at 860.  *Creson* further held that, even if costs were shifted to royalty owners, the provisions of § 6.3 "otherwise … obligated" royalty owners to pay such unit expenses.  *Id*.  *Creson* held that these two provisions were in conformity, when § 6.3 was interpreted to allow deduction of post-production expenses.  *Id*.  The New Mexico Court stated that § 14.3 "specifies that the royalties will be free from the costs of production," but "does not permit royalty owners to reap the benefits of an enhanced value of the gas sold downstream."  *Id*. ¶ 30, 10 P.3d at 860.  *Creson* held that "because 'net proceeds … at the well' is an unambiguous phrase and evinces a clear intent that deductions will be made and the gas is to be

---

[11] § 14.3 in *Creson* and in the case before this Court are identical, except that § 14.3 in the case before the Court is entitled "Royalty Owners Free of Costs" while in *Creson* the title is "Royalty Owners Free of Cost."  *Creson*, 2000-NMCA-081, ¶ 7, 10 P.3d at 856.  [Doc. 1-1, p. 21]  The definitions of "Unit Expense" and "Unit Operations" are identical.  *Creson*, 2000-NMCA-081, ¶ 5, 10 P.3d at 854.  [Doc. 1-1, p. 4]

valued at the wellhead," the computation of royalties "for gas sold downstream [is] subject to deductions for post-production, value-enhancing costs." *Id*. ¶ 36, 10 P.3d at 862.

### C.  Sales to which § 6.3 is applicable

Plaintiffs assert that sales from Hess to Linde, Inc. and purchases by Hess from Kinder Morgan should have been used to calculate royalties under § 6.3(a) and (c).  Hess responds that these sales do not qualify as the basis for royalty determination under the Unit Agreement.

### (1)  Sales to Linde, Inc.

Plaintiffs argue that the sales in 2008-2009 to Linde, Inc. should have been used to calculate royalties under § 6.3(a) as "net proceeds derived from the sale of Carbon Dioxide Gas at the well."  Plaintiffs allege:  "From July 2008 and until May 2009 Hess sold <u>WBDU</u> $CO_2$ to Linde, Inc. at wells …."  [Doc. 106, p. 6, ¶ 4 (emphasis added)]  Plaintiffs allege that Hess sold for $2.00 per mcf and since sales were at the well, there were no post-production costs that could be deducted.  [Doc. 106, pp. 6, 14]  To support the allegation that it was WBDU $CO_2$, Plaintiffs cite the *Carbon Dioxide Purchase and Sale Agreement* between Linde, Inc. and Hess [Doc. 82-3], and seven royalty invoices from Hess to Linde, Inc. [Doc. 106-1, pp. 1-7].  Although the former refers to Hess as owner of the West Bravo Dome Facility, the agreement refers to the "West Bravo Dome Field" as including the Mitchell lease, not just the West Bravo Dome Gas Unit; the agreement further specifies that "[n]o specific Wells will be committed to making such deliveries."  [Doc. 82-3, pp. 1-2]  And the seven invoices all show royalty "on $CO_2$ taken from the Mitchell Lease."  [Doc. 106-1, pp. 1-7]

In its response to MSJ #1, Hess twice admitted that sales to Linde were from the WBDU:

8.  Disputed as stated.  Hess admits that it sold CO2 to Linde, Inc. <u>from the WBDU</u> from approximately 2008-2009.

21

[Doc. 89, p. 4, ¶ 8 (emphasis added); Doc. 89, p. 6, ¶ 14 (admitting Plaintiffs' allegation that "Hess has sold volumes of <u>WBDU</u> CO2 … [to] Linde, Inc. to sell up to 1,000 Mcf per day of untreated <u>WBDU</u> CO2" (emphasis added))]   But in its response to MSJ #2, Hess contradicts itself, arguing that sales to Linde were not from the WBDU, but from wells under the Mitchell lease that were not incorporated into the WBDU until November 2010.  [Doc. 118, pp. 2-3, ¶ 4] In support, Hess cites:  seven invoices for the sales to Linde showing royalties "on $CO_2$ taken from the Mitchell Lease" [Doc. 106-1, pp. 1-7]; Hughart deposition referring to Linde sales as "local sales" on which royalty was required [Doc. 115-2, pp. 3-4; Doc. 118-2, pp. 2-4]; and a response by Plaintiffs stating that 42,331 acres of Mitchell leases were added to WBDU on November 3, 2010 [Doc. 104, p. 4 n.2].

Plaintiffs reply that the Linde sales should be used to calculate royalties under § 6.3(a) because Mitchell agreed in 2009 that its lease acreage would be included in the WBDU, and the wells in question were tied into the WBDU gathering system over a period of time in 2009. [Doc. 126, p. 7 n.2 (citing Mitchell deposition, Doc. 126-3, pp. 10-11 (76:06-78:08); and Holcomb deposition, Doc. 126-2, p. 79)]

Hess further argues that Linde sales should not be used to determine WBDU royalty because the Linde sales were temporary and small in volume.  [Doc. 118, p. 24]  Plaintiffs respond that § 6.3(a) does not require a minimum volume before a sale at the well is used to calculate royalties.  [Doc. 126, p. 12]  The Court agrees with Plaintiffs that if the Linde sales are otherwise applicable as the basis for royalty calculation under § 6.3, the extent of the sales would not be relevant under the Unit Agreement calculation.

The Court concludes that there are disputed issues of material fact which prevent determination of whether the Linde sales should have been used to calculate Plaintiffs' royalties under § 6.3(a).

### (2) Purchases from Kinder Morgan

Plaintiffs assert that purchases of BDU $CO_2$ by Hess from Kinder Morgan should be used as the basis to calculate Plaintiffs' royalties under § 6.3(c).  § 6.3(c) provides that "the State … may require the payment of royalty … at a price per m.c.f. equal to the maximum price being paid …."  Hess admits that it paid the State of New Mexico Land Office royalties based on the Kinder Morgan sales.  Plaintiffs claim that they are entitled to calculation of royalties on the same basis, because the Unit Agreement provides that their royalties "shall be based on the greatest of" the determinations under § 6.3(a), (b), and (c).  [Doc. 1-1, p. 12]

Hess argues that § 6.3(c) gives the State of New Mexico "most favored nation" status and is not applicable to determination of royalties to private parties like Plaintiffs.  In the alternative, Hess argues that if the Kinder Morgan price is to be used, it is a downstream value from which actual post-production costs must be deducted to determine a wellhead value, and that Plaintiffs' royalties must be based on that wellhead value.  Hess admits that it has "paid the State Land Office additional royalties based on the State Land Office's assessment," but states that it is contesting that assessment and seeking a refund based on Hess's claim that it should have deducted post-production costs but did not do so.  [Doc. 89, pp. 6-7, ¶ 20]

The Court concludes that it may not have been presented with all of the relevant facts and circumstances, and that Hess's claim against the State Land Office may lead to determinations by the New Mexico state courts that may be relevant to this Court's resolution of the particular claims here.

### (3)  Conclusion on Linde and Kinder Morgan sales

The parties disagree on whether calculation of Plaintiffs' royalties should have been based on the Linde sales and Kinder Morgan purchases.  The Court concludes that there are disputed factual issues and unresolved issues of New Mexico law precluding the Court from resolving this disagreement at this point.  The Court further concludes, however, that it is unnecessary to decide now whether the Linde and Kinder Morgan sales are appropriate bases on which to calculate Plaintiffs' royalties under § 6.3(a) and (c); the motion before the Court requests resolution of a narrow legal question which can be determined without decision on the applicability of these particular sales.

### D.  Conclusion on *Plaintiffs' Motion for Partial Summary Judgment No. 2*

Plaintiffs' motion requests a ruling on a narrow question of law:  If there are sales appropriate to use to calculate royalties under § 6.3(a) and (c), would deductions for production or post-production costs be allowed in calculating Plaintiffs' royalties or in presenting evidence on damages?  The Court answers that New Mexico law allows deduction of post-production costs (but not production costs) under both (a) and (c) of § 6.3.

The Court concludes that it need not reach, at this time, the further questions of whether the Linde and Kinder Morgan sales are appropriate bases for determination of royalties, or whether § 6.3(c) is applicable for determination of Plaintiffs' royalties.

**IT IS THEREFORE ORDERED THAT:**

(1)  Plaintiffs' *Motion for Partial Summary Judgment No. 1* [Doc. 80] is **GRANTED in part** and

**DENIED in part**, as discussed above; and

(2)  *Plaintiffs' Motion for Partial Summary Judgment No. 2* [Doc. 106] is **DENIED**.


_____

**UNITED STATES DISTRICT JUDGE**